**PHILLIPS PETROLEUM CO.**

v.

**KOCH ELLIS MARINE CONTRACTORS, Inc.**

**THE KE–14.**

**No. 2041.**

United States District Court
E. D. Louisiana.
New Orleans Division.
Jan. 8, 1954.

Terriberry, Young, Rault & Carroll, Benjamin W. Yancey, Alfred M. Farrell, Jr., New Orleans, La., for libellant.

Cobb & Wright, Joseph V. Ferguson, II, New Orleans, La., for respondent.

CHRISTENBERRY, Chief Judge.

The above entitled cause having come on for hearing on the pleadings and proofs of the respective parties, and having been argued by respective counsel, the Court being fully informed in the premises, after due deliberation makes the following findings of fact and conclusions of law:

### Findings of Fact

1.

On May 16, 1950 libelant and respondent entered into a contract in letter form whereby respondent agreed to carry crude oil production of libelant in respondent's barges from Bastian Bay Field in Plaquemines Parish to Buras, Louisiana, and thence to the New Orleans area at a certain rate per barrel, to be effective June 1, 1950.

2.

By virtue of the contract, libelant agreed to furnish loading and pipeline facilities, power and pumps. Respondent agreed to pay all costs of transporting the oil from the storage tanks in the Bastian Bay Field to Buras and thence to delivery at New Orleans.

3.

Between 9:30 P. M. and 11:00 P. M. on the night of December 8, 1950, respondent's tug Joe L. Hill arrived at the dock on the Mississippi River near Buras with the empty barge KE–14 in tow. The tug removed from the dock the loaded barge KE–27 and spotted the empty KE–14 at the pipeline location at the dock. After the empty barge had been moored by the crew of the tug, it departed leaving the barge unattended.

4.

Beginning on December 9, smaller barge loads of crude oil were transferred by respondent from the storage tanks to the KE–14 until it was loaded with 6,162.37 barrels of crude oil. Loading was completed at about 5:00 P. M. on December 12. Thereafter, those in charge of the barge departed and left it unattended and unlit for the night.

In the late afternoon of December 14, 1950, when those in charge returned to the dock, in order to connect the pipeline to transfer oil from a smaller barge, they found that the KE–14 was missing and presumably had sunk at its moorings.

5.

On December 22, 1950, the barge was raised and salvaged by respondent from a location a few hundred feet out from the dock on the bottom of the river. The entire cargo of 6,162.37 barrels of

crude oil had been lost as a result of the sinking.

Examination of the KE–14 upon raising disclosed open cracks in the welding of the plate of both the forward and aft rakes. The cracks were at the port and starboard forward corners, and at the starboard aft corner, located immediately below the headlog and knuckle. In the cracked areas were traces of cement filling indicating that prior fractures had opened.

Some cargo valves and cargo hatches were found open. The forward rake was odorless and fresh. There was a heavy crude oil deposit on the braces and trusses of the aft compartment which indicated that the forward rake took water, and, in the sinking, the cargo escaped and flowed aft through open valves and cargo hatches.

### 6.

The Certificate of Inspection of the barge KE–14 provided that when the barge is moored to a dock, unless gas-freed, there should be a licensed officer or a certificated tankerman available from the towing vessel, or that watchman service be provided.

### 7.

There was no severe weather in the area between December 9 and December 14. No small craft warnings were issued immediately before or during the period. The weather bureau at the nearest station on the Mississippi River at Burwood, Louisiana, recorded the wind at its maximum velocities as follows:

December 9, NNE—25 miles with 0.21 rainfall between noon and 3:00 P. M.; December 10, N—26 miles; December 11, WSW—20 miles; December 12, WSW—18 miles, WNW—18 miles; December 13, ENE—10 miles, SSE—10 miles; December 14, NNW—12 miles.

### 8.

The steel tank barge KE–14 was constructed in 1940. Its registered dimensions were 170' in length, 35' in beam and 8.6' in depth. It had six cargo compartments and two rake tanks.

The Coast Guard certificated the barge after an Annual Inspection Report and Vessel Drydock Examination. The last prior drydocking was on September 26, 1950, at which time certain repairs were necessary. Among them were: to inspect for and remove cement boxes; repair leaks in way thereof; vee and weld port and starboard rake knuckles; search out, vee and weld any fractures found in head and stern. The repairs appear to have been carried out substantially by September 28. However, there is no proof of gas-freeing and internal inspection of the rakes for cement boxes and cemented cracks in the way thereof. The shipyard's invoice and specifications at the completion of the work did not include gas-freeing and internal inspection for cemented cracks.

### 9.

Respondent was the bareboat charterer and owner *pro hac vice* of the barge KE–14. The owners were Harry G. Koch, respondent's president, and Mittie Manton Ellis, a partnership.

## Conclusions of Law
### 1.

This court has jurisdiction over the subject-matter and parties in admiralty.

### 2.

The letter agreement, in the nature of a private contract of affreightment, carries with it respondent's absolute warranty of a seaworthy barge.

### 3.

The circumstances of the sinking and loss of cargo give rise to a presumption of unseaworthiness. Respondent has failed to rebut the presumption by the weight of the testimony or explain the cause of the sinking by credible evidence.

### 4.

The absence of a watchman or of any attendant at all was a clear violation of the Coast Guard requirement in the Cer-

tificate of Inspection and constituted a form of unseaworthiness.

The hull itself was unseaworthy as the evidence of pre-existing unrepaired cracks plainly showed. As a result the KE–14 took water, broke its moorings and eventually sank.

### 5.

Aside from the breach of the warranty of seaworthiness, the contract carried the duty of respondent to tend to its barge before, during and after loading at the dock. Respondent negligently failed to attend the barge or provide for a watchman before, during and after loading. The barge when empty was left unattended after the departure of the tug and remained so throughout the night of December 8 until the hose was fitted for loading the next day. The practice of leaving the unmanned barge continued each night. When the barge was fully loaded about 5:00 P. M. on December 12, respondent did not then provide a tug to remove it and those in charge left and did not return to the dock until the afternoon of December 14 when the KE–14 was discovered missing. Had respondent discharged its duty to attend the barge, it is likely that the chafing of the mooring lines and gradual sinking could have been arrested. This negligence was a proximate cause of the sinking and loss of libelant's cargo.

### 6.

The loss of libelant's cargo in the sinking was caused by the unseaworthiness of the barge KE–14, and by the sole fault of respondent.

### 7.

Libelant is entitled to a decree against respondent, the Barge KE–14 and its claimant and stipulators in the amount of its damages, with interest from the date of judicial demand until paid, and costs.

Judgment may be entered accordingly.